UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11577-RGS

MARTIN K. MICHELMAN,
   Plaintiff,

v.

SUFFOLK COUNTY, SUFFOLK
COUNTY SHERIFF'S DEPARTMENT, and
ANDREA J. CABRAL, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES
   Defendant.

## **MOTION TO AMEND THE COMPLAINT**

Plaintiff Martin K. Michelman hereby moves pursuant to Fed. R. Civ. P. 15 for leave to amend his complaint. Plaintiff's proposed First Amended Complaint is attached as Exhibit 1.

The proposed amendments include a claim that Plaintiff was fired in June 2004 for his good faith oppositions to his employer's plan to violate Massachusetts regulations on in-service training for correction officers. This claim is being brought well within the relevant statute of limitations, and poses no undue prejudice on the Defendants. As will be shown, the Plaintiff's Motion to Amend the Complaint should be allowed, and Exhibit 1 should be filed as Plaintiff's First Amended Complaint.

1.  Plaintiff was a Deputy Superintendent of Training and Special Operatoins in June 2004, when he was fired by Defendants. Plaintiff brought this action, arising under 42 U.S.C. § 1983, alleging that Plaintiff was terminated in violation of his First Amendment

rights to free speech and association. The original complaint alleged that Michelman was terminated for statements he made to the effect that the Suffolk County Sheriff's Department was not prepared for the risks associated with the upcoming DNC convention.

2.      The proposed new allegations involve the fact that the Defendant Suffolk County Sheriff's Department (SCSD) was required, by law, to provide correction officers with at least 40 hours of in-service training every year. This in-service training included various safety related courses. In the Spring of 2004, the SCSD wanted to count small arms training as part of the regulatory required training, and forego the required safety related training. Plaintiff opposed the view that the small arms training counted toward the forty hour annual training requirement, as he believed that such inclusion violated the regulation.

3.      Through the course of discovery in this case, the Plaintiff has learned that one of the reasons that he was fired was because "he repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes." See Exhibit 2.

4.      Plaintiff's good faith oppositions to what he regarded as an illegal training plan, which had the effect of precluding required safety-related training to corrections officers, are constitutionally protected under the First Amendment. Thus, Plaintiff seeks to recover for wrongful termination, which was based on retaliation for his opposition to the SCSD's illegal training plan.

5.      This new claim, like the original one, arises under 42 U.S.C. § 1983. Plaintiff is not alleging a wholly new cause of action. Moreover, this claim is being brought well

2

within the three year statute of limitations for section 1983 claims. Plaintiff's termination

took place less than two years ago. If this motion is not granted, for example, Plaintiff

would be perfectly entitled to file a wholly new civil action including this claim. Such

duplicative filings would not be in the parties' interests, nor would it be in the interests of

this court.

6.      The Defendants are not prejudiced by these new allegations. We continue to be

within the discovery period. The Defendants have not yet taken Plaintiff's deposition (it

is currently scheduled for May 24, 2006), and so they cannot claim to be blindsided by

new allegations after discovery has closed. Thus, Defendants will have ample

opportunity to take discovery on these new, and timely filed allegations. While

Defendants have filed paper discovery requests, to which Plaintiff has responded, the new

allegations contained in the First Amended Complaint would require no new disclosures

in response to those discovery requests.

WHEREFORE, Plaintiff Martin K. Michelman hereby requests that his Motion to

Amend by granted, and that the proposed First Amended Complaint, attached hereto as

Exhibit 1, be filed by the Court.

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA  02108
(617) 742-7010, ext. 305
fax (617) 742-7225


## RULE 7.1 CERTIFICATION

I certify that on May 12, 2005, I conferred telephonically with Kathleen Cawley, Esq., attorney for Defendants, in a good faith attempt to resolve the issues contained in this motion.

_____/s/ Robert S. Mantell_____

Michelman motion amend complaint

4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11577-RGS

|  |  |
|---|---|
| MARTIN K. MICHELMAN,<br>　　　　Plaintiff, | ) )<br>) ) |
| v. | ) )<br>) |
| SUFFOLK COUNTY, SUFFOLK<br>COUNTY SHERIFF'S DEPARTMENT, and<br>ANDREA J. CABRAL, IN HER OFFICIAL<br>AND INDIVIDUAL CAPACITIES<br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>) |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

A.　PRELIMINARY STATEMENT

This is an action in law and equity for damages and other relief caused by the

unlawful termination of the Plaintiff, Martin K. Michelman, from his position with the

Suffolk County Sheriff's Department. This case is brought pursuant to 42 U.S.C. § 1983

and the First and Fourteenth Amendments of the United States Constitution. Federal

jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

B.　PARTIES TO THE ACTION

1.　The Plaintiff Martin Michelman resides at 7 Northfield Road, Peabody,

Massachusetts.

2.　Defendant Suffolk County Sheriff's Department is responsible for the inmates and

personnel at certain correctional facilities located within Suffolk County. Defendant

Suffolk County Sheriff's Department maintains an office at Jail, 200 Nashua Street, Boston, Massachusetts.

3. Defendant Suffolk County is a Massachusetts county government of which the Department is an instrumentality.

4. Defendant Andrea Cabral has been Sheriff of Suffolk County since approximately December 2002. At all relevant times, Defendant Cabral held the authority to remove employees of the department, including the Plaintiff. Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

## COUNT I – WRONGFUL TERMINATION--
## 42 U.S.C. § 1983

5. During the relevant period of time, Plaintiff was employed to work in the Suffolk County Sheriff's Department. As of June 1, 2004, Plaintiff served in the position of Deputy Superintendent of Training and Special Operations.

6. As Deputy Superintendent of Training and Special Operations, Plaintiff was an at-will employee.

7. In the Spring of 2004, planning and preparations were underway for security during the period in which DNC convention activities would occur in Boston.

8. In or about March, April and/or May 2004, at a number of meetings, Plaintiff made statements to the effect that he believed that more staff, than was planned, should be trained and assigned to assist the department in an emergency situation, and that different types of training, than was planned, be provided.

9. At a meeting on or about April 30, 2004, Plaintiff suggested that 70 individuals receive perimeter control training, but Deputy Superintendent of Investigations Theiss rejected the suggestion.

2

10.     With regard to the Jail and House of Corrections, the plan in place was to staff the Jail and the House of Corrections with a few more staff than usual, and rely on the Boston Police or Metrolec (a combination of city and town police who do not ordinarily work together), to assist in an emergency situation at the prison(s). According to the plan, the Boston Police Department or Metrolec contingent would be stationed a few miles away at Madison Park High School.

11.     In or about mid-May 2004, Plaintiff spoke with Richard Wells, Deputy Chief of the Milton Police, Commanding Officer of the Metrolec Special Tactics and Response Division. Wells told Plaintiff that the House of Corrections had to be more thoroughly fortified, with a greater presence of staff and dogs. The conversation confirmed for Plaintiff that more staff, than planned, was necessary. Plaintiff informed his superiors concerning the conversation with Wells. In addition, Plaintiff was present at a meeting in which Wells communicated his suggestion for a stronger security presence to Deputy Superintendent of Investigations Theiss.

12.     On or about May 24, 2004, Elizabeth Keeley, Chief of Staff wrote an e-mail to Plaintiff stating, "Thank you for being responsive to the training needs for our DNC preparation. However, we are **not** going to have a tactical response team, therefore, we are not in need of nor are we going to have any tactical training in preparation for the DNC." Plaintiff discussed this e-mail with others.

13.     On or about May 21, 2004, Plaintiff met with Captain Scaduto and discussed options for training in preparation for the DNC convention. On or about May 23, 2004, Captain Scaduto sent Superintendent Horgan a memorandum advocating that Plaintiff's suggestions for training be implemented.

3

14.     On or about June 10, 2004, Plaintiff conducted a command staff training in preparation for the DNC convention events in July. The goal of the training was to prepare the staff to protect and control the Jail and the House of Corrections, in an emergency situation in the context of the DNC convention. Plaintiff truthfully communicated the plans as they stood at the time.

15.     In light of Plaintiff's statements concerning the plans, some of the participants became concerned that that the plans were insufficient to guarantee the safety of the prisons. They asked why the department was not doing more to prepare for emergency situations. They further asked whether Deputy Superintendent Theiss was responsible for the plan. They asked what they should do about their concerns about the plan, and Plaintiff responded that they should speak with the Superintendent.

16.     Plaintiff made his statements in the interest of public health and safety.

17.     By regulation, Correctional Officers were required to complete at least forty hours per year of in-service training, which should include such subjects as suicide precautions, safety procedures and fire and emergency procedures. See 103 CMR 915.

18.     The SCSD determined that it was going to count Glock (pistol) training toward the forty hour in-service training requirement, despite the fact that such training did not fall within the scope of the in-service training requirement.

19.     In Spring 2004, Plaintiff repeatedly opposed the SCSD's plan to count the Glock training towards the in-service training requirement, as he felt, in good faith, that the plan violated the regulation, and that the training would be counted in lieu of important correctional officer safety-related training.

4

20.    Based on the Plaintiff's statements made on or about June 10, 2005, and/or his

opposition to the violation of the requirement of forty hours of in-service training,

Defendant(s) decided to effectuate Plaintiff's termination.

21.    On June 11, 2004, Plaintiff met in the morning with Deputy Superintendent of

Investigations Theiss and Superintendent of the House of Corrections Horgan. At this

meeting, they said that they received telephone calls from participants in the class who

said that Plaintiff said that the Department was not doing enough in preparation for the

DNC, that the department was insufficiently prepared, and that if they did not like it, they

should call the Superintendent. They said words to the effect that even if Plaintiff did not

agree with the plan, that he should not have expressed any disapproval of the plan.

Plaintiff was instructed not to speak at the subsequent command staff meeting concerning

the DNC.

22.    On June 11, 2004, after the command staff meeting, Plaintiff met again with

Theiss, Horgan and Superintendent of the Jail Sumpter. They asked Plaintiff to explain

what happened in the class and Plaintiff did so.

23.    As of June 11, 2004, Plaintiff was placed on administrative leave without pay.

24.    By a letter dated June 11, 2004, written by Elizabeth Keeley, Chief of Staff at the

Suffolk County Sheriff's Department, Plaintiff was informed that there would be a

hearing to determine whether there was just cause to terminate his employment. The

letter stated: "Your conduct at this training constituted insubordination as you presented

the Department in an unfavorable light in its preparedness for the DNC events."

25.    The June 11, 2004 letter contained a number of other false and pretextual reasons

for initiating Plaintiff's termination.

5

26.     A pre-termination hearing was scheduled. However, Plaintiff had no legal or contractual right to a pre-termination hearing.

27.     On June 16, 2004, a pre-termination hearing took place before Hearing Officer Charles Abate. At the hearing, Defendants advanced numerous false and pretextual reasons for termination.

28.     Mr. Abate found, in part, that Mr. Michelman had been terminated due to the fact that he "repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes," and that he "continually advocated a larger and more public law enforcement role as a result of the convention." On instruction from Chief of Staff Keeley, Mr. Abate took the unprecedented step of altering his findings and deleting these two sections from his memorandum.

29.     By letter dated June 21, 2004, Mr. Michelman was informed that "hearing officer Charles Abate has determined that there is just cause for your termination from the Suffolk County Sheriff's Department."

30.     Defendant Cabral was the final decision maker, who was responsible for initiating Plaintiff's termination.

31.     Defendant Cabral has, on other occasions, retaliated against other employees based on their First Amendment protected speech and/or political affiliation.

32.     By letter dated April 26, 2005, James M. Davin, Deputy General Counsel for the Suffolk County Sheriff's Department, stated that Plaintiff was "not entitled to a hearing."

33.     Plaintiff was terminated in violation of his First Amendment rights to freedom of speech and association, as implemented by 42 U.S.C. § 1983.

6

34.    As a result of the unlawful termination, Plaintiff suffered lost pay and benefits,

and suffered emotional distress, for which he seeks compensation.

**Wherefore, the Plaintiff requests that this Court order:**

a.    that the Defendant(s) compensate Plaintiff for any loss of wages and/or
      benefits incurred as a result of his termination;

b.    that the Plaintiff be awarded an amount of money which will fairly
      compensate him for his emotional and physical pain and suffering;

c.    that the Plaintiff be awarded attorney's fees and costs.

d.    that the Defendant Sheriff Cabral be ordered to pay the Plaintiff punitive
      damages.

e.    that the Defendants pay the Plaintiff interest on any judgment entered
      from the time of filing of this suit;

f.    such relief as may be just and proper and/or which will make the Plaintiff
      whole.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS OF HIS
COMPLAINT.

                                    The Plaintiff,
                                    By his Attorneys


                                    /s/ Robert S. Mantell
                                    Kevin G. Powers, BBO #405020
                                    Robert S. Mantell, BBO #559715
                                    Rodgers, Powers & Schwartz
                                    18 Tremont Street, Suite 500
                                    Boston, MA 02108
                                    (617) 742-7010

Michelman first amended complaint

7

# EXHIBIT 2

TO:        Sheriff Cabral
           Chief of Staff Keeley
FROM:      Charlie Abate
RE:        Martin Michelman
DATE:      June 18, 2004

A pre-termination hearing was held on June 16, 2004 to determine whether there is just
cause to terminate Deputy Superintendent Michelman from his *at will* position as the
Sheriff's Director of Training. Michelman was present with his attorney, Doug Louison,
and statements were presented by the Chief of Staff and Deputy Superintendent Viktor
Theiss.

In this circumstance, just cause is defined as any reason not otherwise illegal.

Specifically, after reviewing my notes and recollections of the statements made by the
Chief of Staff and Theiss about their respective tenures as Michelman's direct
supervisor, I find that Michelman:

- had been repeatedly inappropriate and unprofessional in his dealings with
  fellow Department managers, most notably the Director of Personnel;
- had been disrespectful and derogatory in numerous internal e-mail
  communications;
- exceeded his authority when he unilaterally made decisions regarding the
  sheduling of TABE tests and fitness evaluations and the designation of SERT
  officers;
- embarrassed  Sheriff Cabral when he snidely and publicly derided Hampshire
  County Sheriff Garvey in an external e-mail to other members of the Mass.
  Sheriff's Association training committee, which led to his written apology and
  resignation from the committee;
- continually advocated a larger and more public law enforcement role as a
  result of the convention than the Department indicated was either affordable
  or necessary, and despite the dedication of resources equivalent to his own
  proposal;
- sowed confusion and dissension amongst the command staff when he
  intimated that the Department was not prepared for the security demands of
  the upcoming Democratic National Convention despite having participated in
  and concurred with the Department's preparations;
- failed to produce, despite several requests, a curriculum for training
  command and other staff to meet the security demands for which he
  intimated the Department was unprepared;
- repeatedly disputed the Department's decision that small arms training
  qualified as in-service training for regulatory purposes; and
- in general, failed to sufficiently improve his communication and inter-personal
  skills despite intense and repeated direction and counselling.

I further find that his allegations of retaliation are unsupported by his own testimony. It
was alleged that Theiss urged Michelman to remove one John Grennon as an instructor
due to union activity, and that his termination is in retaliation for his opposition to that
action; Michelman admitted, however, that Theiss actually urged removal of six of the



eight instructors in Training for a variety of reasons related to job performance and competency, but demurred in response to Michelman's arguments. In Grennon's case, he also conceded that he had walked in on Grennon conducting union business on the telephone when he should have been performing training duties, and had warned him that this was unauthorized. Michelman alleged Theiss made numerous disparaging comments about Grennon and his public criticism of the Sheriff, yet admitted that he himself indicated to his supervisors that Grennon was "dangerous to the Department." Furthermore, as Michelman's supervisor, Theiss would have been within his rights to reassign instructors over Michelman's objections, yet, to this date, those six training instructors remain in their positions.

Through his attorney, Michelman also alleged that his termination on the heels of his DNC briefing qualify him as a "whistle blower." He indicated that while he did not intend to disrupt the plan in place, his truthful answers to questions from the audience, motivated by his concerns for public safety and the safety of Department employees, were understandably misperceived as criticism of the Department's preparedness. It is unclear, however, just where Michelman stands on this issue. He stated that he did not intend to criticize, either explicitly or implicitly, the Department's actions thus far, but in hindsight understands how they could be viewed that way. To me, this indicated that he did not disagree with the Department's plans, which Theiss stated he was intimately involved in and which Michelman supposedly praised when he advised the Boston Police a short time ago that the Department was in good shape. If he in fact was not criticizing the Department in his statements, than he cannot claim to be a "whistle blower."

If, however, he did in fact express his true opinions; it calls into question both his motives and his veracity. Theiss stated that Michelman had advocated a more aggressive and expansive law enforcement role than Theiss and others believed was either possible or necessary. Specifically, Michelman wanted to create and field a "tactical team" to fortify our the perimeter and protect each facility from siege or outright attack by protesters or anarchists, a plan ultimately disapproved by the Chief of Staff; Theiss described an alternative which would make available a roughly equivalent amount of personnel to secure the front and rear entrances of each facility in anticipation of both a police response and one from a NEMLEC team dedicated to our defense, an alternative Michelman had until now publicly embraced, both in his weekly meetings with the command staff and with outside agencies. His allusions to serious saftey concerns arising out of the site assessment by the head of the NEMLEC team, Chief Mills, were apparently never put into writing nor brought to the attention of Theiss, and thus appear to have been intended more to advocate for an expanded law enforcement role for the NEMLEC team rather than in response to any security deficiency in the Department. Finally, Michelman's comments at the June 10 briefing were contrary to those he had been making in the same venue for months, and to outside agencies.

Ultimately, if Michelman truly had public safety concerns of such moment that he feared for the safety of both the public and his fellow employees, he should have attempted to bring these concerns to the attention of Theiss, the Chief of Staff, or the Sheriff, his superiors in the chain of command; he did not.

I find that there is no merit in the allegations of retaliation.

UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11577-RGS

)
MARTIN K. MICHELMAN,                    )
          Plaintiff,                    )
                                        )
v.                                      )
                                        )
SUFFOLK COUNTY, SUFFOLK                 )
COUNTY SHERIFF'S DEPARTMENT, and        )
ANDREA J. CABRAL, IN HER OFFICIAL       )
AND INDIVIDUAL CAPACITIES .             )
          Defendant.                    )
                                        )
_____)

## **MOTION TO AMEND THE COMPLAINT**

Plaintiff Martin K. Michelman hereby moves pursuant to Fed. R. Civ. P. 15 for

leave to amend his complaint. Plaintiff's proposed First Amended Complaint is attached

as Exhibit 1.

The proposed amendments include a claim that Plaintiff was fired in June 2004

for his good faith oppositions to his employer's plan to violate Massachusetts regulations

on in-service training for correction officers. This claim is being brought well within the

relevant statute of limitations, and poses no undue prejudice on the Defendants. As will

be shown, the Plaintiff's Motion to Amend the Complaint should be allowed, and Exhibit

1 should be filed as Plaintiff's First Amended Complaint.

1.    Plaintiff was a Deputy Superintendent of Training and Special Operatoins in June

2004, when he was fired by Defendants. Plaintiff brought this action, arising under 42

U.S.C. § 1983, alleging that Plaintiff was terminated in violation of his First Amendment

rights to free speech and association. The original complaint alleged that Michelman was terminated for statements he made to the effect that the Suffolk County Sheriff's Department was not prepared for the risks associated with the upcoming DNC convention.

2.      The proposed new allegations involve the fact that the Defendant Suffolk County Sheriff's Department (SCSD) was required, by law, to provide correction officers with at least 40 hours of in-service training every year. This in-service training included various safety related courses. In the Spring of 2004, the SCSD wanted to count small arms training as part of the regulatory required training, and forego the required safety related training. Plaintiff opposed the view that the small arms training counted toward the forty hour annual training requirement, as he believed that such inclusion violated the regulation.

3.      Through the course of discovery in this case, the Plaintiff has learned that one of the reasons that he was fired was because "he repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes." See Exhibit 2.

4.      Plaintiff's good faith oppositions to what he regarded as an illegal training plan, which had the effect of precluding required safety-related training to corrections officers, are constitutionally protected under the First Amendment. Thus, Plaintiff seeks to recover for wrongful termination, which was based on retaliation for his opposition to the SCSD's illegal training plan.

5.      This new claim, like the original one, arises under 42 U.S.C. § 1983. Plaintiff is not alleging a wholly new cause of action. Moreover, this claim is being brought well

2

within the three year statute of limitations for section 1983 claims. Plaintiff's termination took place less than two years ago. If this motion is not granted, for example, Plaintiff would be perfectly entitled to file a wholly new civil action including this claim. Such duplicative filings would not be in the parties' interests, nor would it be in the interests of this court.

6.      The Defendants are not prejudiced by these new allegations. We continue to be within the discovery period. The Defendants have not yet taken Plaintiff's deposition (it is currently scheduled for May 24, 2006), and so they cannot claim to be blindsided by new allegations after discovery has closed. Thus, Defendants will have ample opportunity to take discovery on these new, and timely filed allegations. While Defendants have filed paper discovery requests, to which Plaintiff has responded, the new allegations contained in the First Amended Complaint would require no new disclosures in response to those discovery requests.

WHEREFORE, Plaintiff Martin K. Michelman hereby requests that his Motion to Amend by granted, and that the proposed First Amended Complaint, attached hereto as Exhibit 1, be filed by the Court.

3

The Plaintiff
By his attorneys,


_____/s/ Robert S. Mantell_____
Kevin G. Powers
BBO# 405020
Robert S. Mantell
BBO# 559715
Rodgers, Powers & Schwartz LLP
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010, ext. 305
fax (617) 742-7225


## RULE 7.1 CERTIFICATION

I certify that on May 12, 2005, I conferred telephonically with Kathleen Cawley, Esq., attorney for Defendants, in a good faith attempt to resolve the issues contained in this motion.


_____/s/ Robert S. Mantell_____

Michelman motion amend complaint

4

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No.  05-CV-11577-RGS

|  |  |
|---|---|
| MARTIN K. MICHELMAN,<br>　　　　Plaintiff,<br><br>v.<br><br>SUFFOLK COUNTY, SUFFOLK<br>COUNTY SHERIFF'S DEPARTMENT, and<br>ANDREA J. CABRAL, IN HER OFFICIAL<br>AND INDIVIDUAL CAPACITIES<br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

A.    PRELIMINARY STATEMENT

This is an action in law and equity for damages and other relief caused by the

unlawful termination of the Plaintiff, Martin K. Michelman, from his position with the

Suffolk County Sheriff's Department.  This case is brought pursuant to 42 U.S.C. § 1983

and the First and Fourteenth Amendments of the United States Constitution.  Federal

jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

B.    PARTIES TO THE ACTION

1.    The Plaintiff Martin Michelman resides at 7 Northfield Road, Peabody,

Massachusetts.

2.    Defendant Suffolk County Sheriff's Department is responsible for the inmates and

personnel at certain correctional facilities located within Suffolk County.  Defendant

Suffolk County Sheriff's Department maintains an office at Jail, 200 Nashua Street, Boston, Massachusetts.

3.    Defendant Suffolk County is a Massachusetts county government of which the Department is an instrumentality.

4.    Defendant Andrea Cabral has been Sheriff of Suffolk County since approximately December 2002. At all relevant times, Defendant Cabral held the authority to remove employees of the department, including the Plaintiff. Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

COUNT I – WRONGFUL TERMINATION--
42 U.S.C. § 1983

5.    During the relevant period of time, Plaintiff was employed to work in the Suffolk County Sheriff's Department. As of June 1, 2004, Plaintiff served in the position of Deputy Superintendent of Training and Special Operations.

6.    As Deputy Superintendent of Training and Special Operations, Plaintiff was an at-will employee.

7.    In the Spring of 2004, planning and preparations were underway for security during the period in which DNC convention activities would occur in Boston.

8.    In or about March, April and/or May 2004, at a number of meetings, Plaintiff made statements to the effect that he believed that more staff, than was planned, should be trained and assigned to assist the department in an emergency situation, and that different types of training, than was planned, be provided.

9.    At a meeting on or about April 30, 2004, Plaintiff suggested that 70 individuals receive perimeter control training, but Deputy Superintendent of Investigations Theiss rejected the suggestion.

2

10.     With regard to the Jail and House of Corrections, the plan in place was to staff the
Jail and the House of Corrections with a few more staff than usual, and rely on the
Boston Police or Metrolec (a combination of city and town police who do not ordinarily
work together), to assist in an emergency situation at the prison(s). According to the
plan, the Boston Police Department or Metrolec contingent would be stationed a few
miles away at Madison Park High School.

11.     In or about mid-May 2004, Plaintiff spoke with Richard Wells, Deputy Chief of
the Milton Police, Commanding Officer of the Metrolec Special Tactics and Response
Division. Wells told Plaintiff that the House of Corrections had to be more thoroughly
fortified, with a greater presence of staff and dogs. The conversation confirmed for
Plaintiff that more staff, than planned, was necessary. Plaintiff informed his superiors
concerning the conversation with Wells. In addition, Plaintiff was present at a meeting in
which Wells communicated his suggestion for a stronger security presence to Deputy
Superintendent of Investigations Theiss.

12.     On or about May 24, 2004, Elizabeth Keeley, Chief of Staff wrote an e-mail to
Plaintiff stating, "Thank you for being responsive to the training needs for our DNC
preparation. However, we are **not** going to have a tactical response team, therefore, we
are not in need of nor are we going to have any tactical training in preparation for the
DNC." Plaintiff discussed this e-mail with others.

13.     On or about May 21, 2004, Plaintiff met with Captain Scaduto and discussed
options for training in preparation for the DNC convention. On or about May 23, 2004,
Captain Scaduto sent Superintendent Horgan a memorandum advocating that Plaintiff's
suggestions for training be implemented.

3

14.    On or about June 10, 2004, Plaintiff conducted a command staff training in preparation for the DNC convention events in July. The goal of the training was to prepare the staff to protect and control the Jail and the House of Corrections, in an emergency situation in the context of the DNC convention. Plaintiff truthfully communicated the plans as they stood at the time.

15.    In light of Plaintiff's statements concerning the plans, some of the participants became concerned that that the plans were insufficient to guarantee the safety of the prisons. They asked why the department was not doing more to prepare for emergency situations. They further asked whether Deputy Superintendent Theiss was responsible for the plan. They asked what they should do about their concerns about the plan, and Plaintiff responded that they should speak with the Superintendent.

16.    Plaintiff made his statements in the interest of public health and safety.

17.    By regulation, Correctional Officers were required to complete at least forty hours per year of in-service training, which should include such subjects as suicide precautions, safety procedures and fire and emergency procedures. See 103 CMR 915.

18.    The SCSD determined that it was going to count Glock (pistol) training toward the forty hour in-service training requirement, despite the fact that such training did not fall within the scope of the in-service training requirement.

19.    In Spring 2004, Plaintiff repeatedly opposed the SCSD's plan to count the Glock training towards the in-service training requirement, as he felt, in good faith, that the plan violated the regulation, and that the training would be counted in lieu of important correctional officer safety-related training.

4

20.    Based on the Plaintiff's statements made on or about June 10, 2005, and/or his

opposition to the violation of the requirement of forty hours of in-service training,

Defendant(s) decided to effectuate Plaintiff's termination.

21.    On June 11, 2004, Plaintiff met in the morning with Deputy Superintendent of

Investigations Theiss and Superintendent of the House of Corrections Horgan. At this

meeting, they said that they received telephone calls from participants in the class who

said that Plaintiff said that the Department was not doing enough in preparation for the

DNC, that the department was insufficiently prepared, and that if they did not like it, they

should call the Superintendent. They said words to the effect that even if Plaintiff did not

agree with the plan, that he should not have expressed any disapproval of the plan.

Plaintiff was instructed not to speak at the subsequent command staff meeting concerning

the DNC.

22.    On June 11, 2004, after the command staff meeting, Plaintiff met again with

Theiss, Horgan and Superintendent of the Jail Sumpter. They asked Plaintiff to explain

what happened in the class and Plaintiff did so.

23.    As of June 11, 2004, Plaintiff was placed on administrative leave without pay.

24.    By a letter dated June 11, 2004, written by Elizabeth Keeley, Chief of Staff at the

Suffolk County Sheriff's Department, Plaintiff was informed that there would be a

hearing to determine whether there was just cause to terminate his employment. The

letter stated: "Your conduct at this training constituted insubordination as you presented

the Department in an unfavorable light in its preparedness for the DNC events."

25.    The June 11, 2004 letter contained a number of other false and pretextual reasons

for initiating Plaintiff's termination.

5

26.     A pre-termination hearing was scheduled. However, Plaintiff had no legal or contractual right to a pre-termination hearing.

27.     On June 16, 2004, a pre-termination hearing took place before Hearing Officer Charles Abate. At the hearing, Defendants advanced numerous false and pretextual reasons for termination.

28.     Mr. Abate found, in part, that Mr. Michelman had been terminated due to the fact that he "repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes," and that he "continually advocated a larger and more public law enforcement role as a result of the convention." On instruction from Chief of Staff Keeley, Mr. Abate took the unprecedented step of altering his findings and deleting these two sections from his memorandum.

29.     By letter dated June 21, 2004, Mr. Michelman was informed that "hearing officer Charles Abate has determined that there is just cause for your termination from the Suffolk County Sheriff's Department."

30.     Defendant Cabral was the final decision maker, who was responsible for initiating Plaintiff's termination.

31.     Defendant Cabral has, on other occasions, retaliated against other employees based on their First Amendment protected speech and/or political affiliation.

32.     By letter dated April 26, 2005, James M. Davin, Deputy General Counsel for the Suffolk County Sheriff's Department, stated that Plaintiff was "not entitled to a hearing."

33.     Plaintiff was terminated in violation of his First Amendment rights to freedom of speech and association, as implemented by 42 U.S.C. § 1983.

34.    As a result of the unlawful termination, Plaintiff suffered lost pay and benefits,

and suffered emotional distress, for which he seeks compensation.

**Wherefore, the Plaintiff requests that this Court order:**

a.    that the Defendant(s) compensate Plaintiff for any loss of wages and/or benefits incurred as a result of his termination;

b.    that the Plaintiff be awarded an amount of money which will fairly compensate him for his emotional and physical pain and suffering;

c.    that the Plaintiff be awarded attorney's fees and costs.

d.    that the Defendant Sheriff Cabral be ordered to pay the Plaintiff punitive damages.

e.    that the Defendants pay the Plaintiff interest on any judgment entered from the time of filing of this suit;

f.    such relief as may be just and proper and/or which will make the Plaintiff whole.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS OF HIS COMPLAINT.

The Plaintiff,
By his Attorneys


/s/ Robert S. Mantell
Kevin G. Powers, BBO #405020
Robert S. Mantell, BBO #559715
Rodgers, Powers & Schwartz
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010

Michelman first amended complaint

7

# EXHIBIT 2

TO:        Sheriff Cabral
           Chief of Staff Keeley
FROM:      Charlie Abate
RE:        Martin Michelman
DATE:      June 18, 2004

A pre-termination hearing was held on June 16, 2004 to determine whether there is just cause to terminate Deputy Superintendent Michelman from his *at will* position as the Sheriff's Director of Training. Michelman was present with his attorney, Doug Louison, and statements were presented by the Chief of Staff and Deputy Superintendent Viktor Theiss.

In this circumstance, just cause is defined as any reason not otherwise illegal.

Specifically, after reviewing my notes and recollections of the statements made by the Chief of Staff and Theiss about their respective tenures as Michelman's direct supervisor, I find that Michelman:

- had been repeatedly inappropriate and unprofessional in his dealings with fellow Department managers, most notably the Director of Personnel;
- had been disrespectful and derogatory in numerous internal e-mail communications;
- exceeded his authority when he unilaterally made decisions regarding the sheduling of TABE tests and fitness evaluations and the designation of SERT officers;
- embarrassed Sheriff Cabral when he snidely and publicly derided Hampshire County Sheriff Garvey in an external e-mail to other members of the Mass. Sheriff's Association training committee, which led to his written apology and resignation from the committee;
- continually advocated a larger and more public law enforcement role as a result of the convention than the Department indicated was either affordable or necessary, and despite the dedication of resources equivalent to his own proposal;
- sowed confusion and dissension amongst the command staff when he intimated that the Department was not prepared for the security demands of the upcoming Democratic National Convention despite having participated in and concurred with the Department's preparations;
- failed to produce, despite several requests, a curriculum for training command and other staff to meet the security demands for which he intimated the Department was unprepared;
- repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes; and
- in general, failed to sufficiently improve his communication and inter-personal skills despite intense and repeated direction and counselling.

I further find that his allegations of retaliation are unsupported by his own testimony. It was alleged that Theiss urged Michelman to remove one John Grennon as an instructor due to union activity, and that his termination is in retaliation for his opposition to that action; Michelman admitted, however, that Theiss actually urged removal of six of the



eight instructors in Training for a variety of reasons related to job performance and competency, but demurred in response to Michelman's arguments. In Grennon's case, he also conceded that he had walked in on Grennon conducting union business on the telephone when he should have been performing training duties, and had warned him that this was unauthorized. Michelman alleged Theiss made numerous disparaging comments about Grennon and his public criticism of the Sheriff, yet admitted that he himself indicated to his supervisors that Grennon was "dangerous to the Department." Furthermore, as Michelman's supervisor, Theiss would have been within his rights to reassign instructors over Michelman's objections, yet, to this date, those six training instructors remain in their positions.

Through his attorney, Michelman also alleged that his termination on the heels of his DNC briefing qualify him as a "whistle blower." He indicated that while he did not intend to disrupt the plan in place, his truthful answers to questions from the audience, motivated by his concerns for public safety and the safety of Department employees, were understandably misperceived as criticism of the Department's preparedness. It is unclear, however, just where Michelman stands on this issue. He stated that he did not intend to criticize, either explicitly or implicitly, the Department's actions thus far, but in hindsight understands how they could be viewed that way. To me, this indicated that he did not disagree with the Department's plans, which Theiss stated he was intimately involved in and which Michelman supposedly praised when he advised the Boston Police a short time ago that the Department was in good shape. If he in fact was not criticizing the Department in his statements, than he cannot claim to be a "whistle blower."

If, however, he did in fact express his true opinions, it calls into question both his motives and his veracity. Theiss stated that Michelman had advocated a more aggressive and expansive law enforcement role than Theiss and others believed was either possible or necessary. Specifically, Michelman wanted to create and field a "tactical team" to fortify our the perimeter and protect each facility from siege or outright attack by protesters or anarchists, a plan ultimately disapproved by the Chief of Staff; Theiss described an alternative which would make available a roughly equivalent amount of personnel to secure the front and rear entrances of each facility in anticipation of both a police response and one from a NEMLEC team dedicated to our defense, an alternative Michelman had until now publicly embraced, both in his weekly meetings with the command staff and with outside agencies. His allusions to serious saftey concerns arising out of the site assessment by the head of the NEMLEC team, Chief Mills, were apparently never put into writing nor brought to the attention of Theiss, and thus appear to have been intended more to advocate for an expanded law enforcement role for the NEMLEC team rather than in response to any security deficiency in the Department. Finally, Michelman's comments at the June 10 briefing were contrary to those he had been making in the same venue for months, and to outside agencies.

Ultimately, if Michelman truly had public safety concerns of such moment that he feared for the safety of both the public and his fellow employees, he should have attempted to bring these concerns to the attention of Theiss, the Chief of Staff, or the Sheriff, his superiors in the chain of command; he did not.

I find that there is no merit in the allegations of retaliation.