UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11577-RGS

MARTIN K. MICHELMAN,
    Plaintiff,

v.

SUFFOLK COUNTY, SUFFOLK
COUNTY SHERIFF'S DEPARTMENT, and
ANDREA J. CABRAL, IN HER OFFICIAL
AND INDIVIDUAL CAPACITIES
    Defendant.

## SECOND MOTION TO AMEND THE COMPLAINT

Plaintiff Martin K. Michelman hereby moves pursuant to Fed. R. Civ. P. 15 for leave to amend his complaint. Plaintiff's proposed Second Amended Complaint is attached as Exhibit 1.

Recently, on May 15, 2006, Plaintiff filed a first Motion to Amend the Complaint. That Motion is still pending. However, Plaintiff now seeks to amend the complaint with allegations additional to the ones sought in the First Amended Complaint. The instant Second Motion to Amend the Complaint is duplicative of the First Motion to Amend. Therefore, to the extent that the Second Motion to Amend the Complaint is granted, the first Motion to Amend is moot.

Plaintiff's Complaint asserts that he was terminated from his position with the Suffolk County Sheriff's Department for making statements relating to the SCSD's state of preparedness for the Democratic National Convention, in violation of his right to

speech under the First Amendment. There are two types of claims that the Plaintiff seeks to add to the original set of allegations. First, Plaintiff wishes to add allegations that he was terminated in violation of the First Amendment because he opposed the SCSD's plan to violate Massachusetts regulations relating to the annual training for correction officers. The addition of the "training" theory is what Plaintiff has sought in his First Motion to Amend the Complaint.

Second, Plaintiff seeks to recover under a State law claim, the Whistleblower Protection Act, G.L. c. 149, § 185.[1] The substance of the WPA claims are mostly duplicative of Plaintiff's First Amendment claim. Plaintiff had intended to file these mostly duplicative WPA claims in State Court, to avoid the possibility that the Defendants could assert eleventh amendment and/or sovereign immunity defenses in Federal Court. However, in order to expedite the case, to increase efficiency, and avoid the prospect of actively litigating two similar cases in different forums, Defendants have agreed to waive such defenses to the WPA claims. See Exhibit 2. Thus, Plaintiff is seeking to add the WPA claims to his Federal Court Complaint.

All of the allegations and claims included in this Second Motion to Amend the Complaint are being filed well within the relevant statutes of limitations, and pose no undue prejudice on the Defendants. As will be shown, the Plaintiff's Second Motion to Amend the Complaint should be allowed, and Exhibit 1 should be filed as Plaintiff's First Amended Complaint.

1. Plaintiff was a Deputy Superintendent of Training and Special Operations in June 2004, when he was fired by Defendants. Plaintiff brought this action, arising under 42

---

[1] The WPA claims embrace the "DNC" and "training" theories of wrongful discharge, and also includes the allegation that Plaintiff was terminated for refusing to participate in, or assist, in unlawfully retaliating against an SCSD because that employee had engaged in union activity.

U.S.C. § 1983, alleging that Plaintiff was terminated in violation of his First Amendment rights to free speech and association. The original complaint alleged that Michelman was terminated for statements he made to the effect that the Suffolk County Sheriff's Department was not prepared for the risks associated with the upcoming DNC convention.

2.  The proposed new allegations involve the fact that the Defendant Suffolk County Sheriff's Department (SCSD) was required, by law, to provide correction officers with at least 40 hours of in-service training every year. This in-service training included various safety related courses. In the Spring of 2004, the SCSD wanted to count small arms training as part of the regulatory required training, and forego the required safety related training. Plaintiff opposed the view that the small arms training counted toward the forty hour annual training requirement, as he believed that such inclusion violated the regulation.

3.  Through the course of discovery in this case, the Plaintiff has learned that one of the reasons that he was fired was because "he repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes." See Exhibit 3.

4.  Plaintiff's good faith oppositions to what he regarded as an illegal training plan, which had the effect of precluding required safety-related training to corrections officers, are constitutionally protected under the First Amendment. Thus, Plaintiff seeks to recover for wrongful termination, which was based on retaliation for his opposition to the SCSD's illegal training plan.

3

5.  This new claim, like the original one, arises under 42 U.S.C. § 1983. The claim is being brought well within the three year statute of limitations for section 1983 claims. Plaintiff's termination took place less than two years ago. If this motion is not granted, for example, Plaintiff would be perfectly entitled to file a wholly new civil action including this claim. Such duplicative filings would not be in the parties' interests, nor would it be in the interests of this court.

6.  Plaintiff also seeks to file parallel state law claims under the Whistleblower Protection Act, G.L. c. 149, § 185. Like the section 1983 claims, the Whistleblower protection act claims seek recovery for retaliatory termination, which was based on Plaintiff's oppositions to, and refusal to participate in, illegal conduct at the Suffolk County Sheriff's Department. These claims are being filed with the Court within the two year statute of limitations for WPA claims, which lapses on or about June 21, 2006.[2]

7.  Originally, Plaintiff had intended to file his WPA claims in State Court, to preclude the possibility that the employer would assert eleventh amendment or sovereign immunity defenses in Federal Court. However, Defendants Suffolk County and the Suffolk County Sheriff's Department have agreed to waive such defenses. Therefore, Plaintiff seeks to add these state law claims to his Federal Complaint, such that the parties need only litigate in a single forum.

8.  The Defendants are not prejudiced by these new allegations. We continue to be within the discovery period. The Defendants have not yet taken Plaintiff's deposition and so they cannot claim to be blindsided by new allegations after discovery has closed.

---

[2] Given that there may be delays in this Courts' ruling on this motion, it is possible that the Plaintiff will file additional Complaints in State and/or Federal Court, to preserve his rights and ensure that his claims are deemed timely filed. However, such additional claims will be voluntarily dismissed or stayed, to the extent that this Court permits the timely amendment of the Complaint.

4

Moreover, the parties have jointly filed, on May 19, 2006, a motion to extend the discovery deadline. Thus, the parties will have ample opportunity to take discovery on these new, and timely filed allegations.

WHEREFORE, Plaintiff Martin K. Michelman hereby requests that his Motion to Amend by granted, and that the proposed First Amended Complaint, attached hereto as Exhibit 1, be filed by the Court.

        The Plaintiff
        By his attorneys,

        /s/ Robert S. Mantell
        Kevin G. Powers
        BBO# 405020
        Robert S. Mantell
        BBO# 559715
        Rodgers, Powers & Schwartz LLP
        18 Tremont Street, Suite 500
        Boston, MA 02108
        (617) 742-7010, ext. 305
        fax (617) 742-7225

## RULE 7.1 CERTIFICATION

I certify that on May 12, 2005, I conferred telephonically with Kathleen Cawley, Esq., attorney for Defendants, in a good faith attempt to resolve the issues contained in this motion.

        /s/ Robert S. Mantell

Michelman motion amend complaint

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISCTRICT OF MASSACHUSETTS

C.A. No. 05-CV-11577-RGS

|  |  |
|---|---|
| MARTIN K. MICHELMAN,<br>Plaintiff,<br><br>v.<br><br>SUFFOLK COUNTY, SUFFOLK<br>COUNTY SHERIFF'S DEPARTMENT, and<br>ANDREA J. CABRAL, IN HER OFFICIAL<br>AND INDIVIDUAL CAPACITIES<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

A.   PRELIMINARY STATEMENT

This is an action in law and equity for damages and other relief caused by the unlawful termination of the Plaintiff, Martin K. Michelman, from his position with the Suffolk County Sheriff's Department. This case is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the United States Constitution. Federal jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343. The State law claims are brought pursuant to this Court's Supplemental Jurisdiction, because the claims arise from the same nucleus of operative facts as the Federal claims.

B.   PARTIES TO THE ACTION

1.   The Plaintiff Martin Michelman resides at 7 Northfield Road, Peabody, Massachusetts.

2.  Defendant Suffolk County Sheriff's Department is responsible for the inmates and personnel at certain correctional facilities located within Suffolk County. Defendant Suffolk County Sheriff's Department maintains an office at Jail, 200 Nashua Street, Boston, Massachusetts.

3.  Defendant Suffolk County is a Massachusetts county government of which the Department is an instrumentality.

4.  Defendant Andrea Cabral has been Sheriff of Suffolk County since approximately December 2002. At all relevant times, Defendant Cabral held the authority to remove employees of the department, including the Plaintiff. Upon information and belief, Defendant Cabral is a resident of the Commonwealth of Massachusetts.

5.  During the relevant period of time, Plaintiff was employed to work in the Suffolk County Sheriff's Department. As of June 1, 2004, Plaintiff served in the position of Deputy Superintendent of Training and Special Operations.

6.  As Deputy Superintendent of Training and Special Operations, Plaintiff was an at-will employee.

7.  In the Spring of 2004, planning and preparations were underway for security during the period in which DNC convention activities would occur in Boston.

8.  In or about March, April and/or May 2004, at a number of meetings, Plaintiff made statements to the effect that he believed that more staff, than was planned, should be trained and assigned to assist the department in an emergency situation, and that different types of training, than was planned, be provided.

9.     At a meeting on or about April 30, 2004, Plaintiff suggested that 70 individuals receive perimeter control training, but Deputy Superintendent of Investigations Theiss rejected the suggestion.

10.    With regard to the Jail and House of Corrections, the plan in place was to staff the Jail and the House of Corrections with a few more staff than usual, and rely on the Boston Police or Metrolec (a combination of city and town police who do not ordinarily work together), to assist in an emergency situation at the prison(s). According to the plan, the Boston Police Department or Metrolec contingent would be stationed a few miles away at Madison Park High School.

11.    In or about mid-May 2004, Plaintiff spoke with Richard Wells, Deputy Chief of the Milton Police, Commanding Officer of the Metrolec Special Tactics and Response Division. Wells told Plaintiff that the House of Corrections had to be more thoroughly fortified, with a greater presence of staff and dogs. The conversation confirmed for Plaintiff that more staff, than planned, was necessary. Plaintiff informed his superiors concerning the conversation with Wells. In addition, Plaintiff was present at a meeting in which Wells communicated his suggestion for a stronger security presence to Deputy Superintendent of Investigations Theiss.

12.    On or about May 21, 2004, Plaintiff met with Captain Scaduto and discussed options for training in preparation for the DNC convention. On or about May 23, 2004, Captain Scaduto sent Superintendent Horgan a memorandum advocating that Plaintiff's suggestions for training be implemented.

13.    On or about May 24, 2004, Elizabeth Keeley, Chief of Staff wrote an e-mail to Plaintiff stating, "Thank you for being responsive to the training needs for our DNC

preparation. However, we are **not** going to have a tactical response team, therefore, we are not in need of nor are we going to have any tactical training in preparation for the DNC." Plaintiff discussed this e-mail with others.

14. On or about June 10, 2004, Plaintiff conducted a command staff training in preparation for the DNC convention events in July. The goal of the training was to prepare the staff to protect and control the Jail and the House of Corrections, in an emergency situation in the context of the DNC convention. Plaintiff truthfully communicated the plans as they stood at the time.

15. In light of Plaintiff's statements concerning the plans, some of the participants became concerned that that the plans were insufficient to guarantee the safety of the prisons. They asked why the department was not doing more to prepare for emergency situations. They further asked whether Deputy Superintendent Theiss was responsible for the plan. They asked what they should do about their concerns about the plan, and Plaintiff responded that they should speak with the Superintendent.

16. Plaintiff made his statements in the interest of public health and safety.

17. By regulation, Correctional Officers were required to complete at least forty hours per year of in-service training, which should include such subjects as first aid and CPR, safety procedures and fire and emergency procedures. See 103 CMR 915.

18. The SCSD determined that it was going to count Glock (pistol) training toward the forty hour in-service training requirement, despite the fact that such training did not fall within the scope of the in-service training requirement and/or was not properly implemented to the exclusion of other types of training.

4

19. In Spring 2004, Plaintiff repeatedly opposed the SCSD's plan to count the Glock training towards the in-service training requirement, as he felt, in good faith, that the plan violated the regulation, and that the training would be counted in lieu of important correctional officer safety-related training.

20. In 2004, John Grennon was a training officer assigned to the Training Division, under Plaintiff. Grennon was actively pursuing various union related grievances and claims against the SCSD.

21. On a number of occasions, Viktor Theiss instructed Plaintiff to "get rid of" Grennon, and transfer him out of Training, due to Grennon's union activity. Mr. Theiss stated words to the effect that the Sheriff did not want Grennon in Training as he was stabbing her in the back with his union grievances and activities. Plaintiff responded with words to the effect of, that Grennon was a very good trainer, and that if Mr. Theiss wanted to get rid of Grennon, Mr. Theiss should do it, but that Plaintiff would not. This type of conversation with Mr. Theiss took place at least three times.

22. On other occasions, the Sheriff told Plaintiff directly that Grennon "had to go," because his union activities made him a bad role model for training purposes. Plaintiff told the Sheriff that he did not see legitimate grounds for taking Grennon out of Training, and that he would not get rid of Grennon. Plaintiff felt, reasonably and in good faith, that Grennon was being unlawfully targeted for transfer back to the Nashua Street Jail due to Grennon's union activities.

23. Based on the Plaintiff's statements made on or about June 10, 2004, and/or his opposition to the violation of the requirement of forty hours of in-service training, and/or

Plaintiff's refusal to remove Grennon from his position in Training, Defendant(s) decided to effectuate Plaintiff's termination.

24. On June 11, 2004, Plaintiff met in the morning with Deputy Superintendent of Investigations Theiss and Superintendent of the House of Corrections Horgan. At this meeting, they said that they received telephone calls from participants in the class who said that Plaintiff said that the Department was not doing enough in preparation for the DNC, that the department was insufficiently prepared, and that if they did not like it, they should call the Superintendent. They said words to the effect that even if Plaintiff did not agree with the plan, that he should not have expressed any disapproval of the plan. Plaintiff was instructed not to speak at the subsequent command staff meeting concerning the DNC.

25. On June 11, 2004, after the command staff meeting, Plaintiff met again with Theiss, Horgan and Superintendent of the Jail Sumpter. They asked Plaintiff to explain what happened in the class and Plaintiff did so.

26. As of June 11, 2004, Plaintiff was placed on administrative leave without pay.

27. By a letter dated June 11, 2004, written by Elizabeth Keeley, Chief of Staff at the Suffolk County Sheriff's Department, Plaintiff was informed that there would be a hearing to determine whether there was just cause to terminate his employment. The letter stated: "Your conduct at this training constituted insubordination as you presented the Department in an unfavorable light in its preparedness for the DNC events."

28. The June 11, 2004 letter contained a number of other false and pretextual reasons for initiating Plaintiff's termination.

6

29.    A pre-termination hearing was scheduled. However, Plaintiff had no legal or contractual right to a pre-termination hearing.

30.    On June 16, 2004, a pre-termination hearing took place before Hearing Officer Charles Abate. At the hearing, Defendants advanced numerous false and pretextual reasons for termination.

31.    Mr. Abate found, in part, that Mr. Michelman had been terminated due to the fact that he "repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes," and that he "continually advocated a larger and more public law enforcement role as a result of the convention." On instruction from Chief of Staff Keeley, Mr. Abate took the unprecedented step of altering his findings and deleting these two sections from his memorandum.

32.    By letter dated June 21, 2004, Mr. Michelman was informed that "hearing officer Charles Abate has determined that there is just cause for your termination from the Suffolk County Sheriff's Department."

33.    Defendant Cabral was the final decision maker, who was responsible for initiating Plaintiff's termination.

34.    Defendant Cabral has, on other occasions, retaliated against other employees based on their First Amendment protected speech and/or political affiliation.

35.    By letter dated April 26, 2005, James M. Davin, Deputy General Counsel for the Suffolk County Sheriff's Department, stated that Plaintiff was "not entitled to a hearing."

7

## COUNT I – WRONGFUL TERMINATION--
## 42 U.S.C. § 1983

36.  Plaintiff's statements and/or conduct, as understood by Defendants, at the June 10, 2004 training, and/or his opposition to the violation of the requirement of forty hours annual in-service training, were protected conduct under the First Amendment.

37.  Defendant(s) decided to effectuate Plaintiff's termination based on conduct protected by the First Amendment.

38.  Plaintiff was terminated in violation of his First Amendment rights to freedom of speech and association, in violation of 42 U.S.C. § 1983.

39.  As a result of the unlawful termination, Plaintiff suffered lost pay and benefits, and suffered emotional distress, for which he seeks compensation.

## COUNT II – WRONGFUL TERMINATION—
## WHISTLEBLOWER PROTECTION ACT – G.L. c. 149, § 185
## DEFENDANTS SUFFOLK COUNTY, SUFFOLK COUNTY SHERIFF'S
## DEPARTMENT AND DEFNDANT CABRAL IN HER OFFICIAL CAPACITY

40.  Plaintiff incorporates and realleges the allegations contained above herein.

41.  Plaintiff was an employee as defined by G.L. c. 149, § 185(a)(1).

42.  Plaintiff reasonably believed that it was important for the protection of public health and safety that the SCSD be properly prepared for the DNC convention, and related risks posed by protesters.

43.  Plaintiff reasonably believed that it was important for the protection of public health and safety that corrections officers be provided forty hours of annual training which properly included a variety of safety-related training.

44.  Plaintiff was terminated, in violation of G.L. c. 149, §§ 185(b)(1) & (3), for [1] making protected statements relating to SCSD's unpreparedness for the DNC convention;

8

or [2] opposing an unlawful plan to limit annual in-service training for corrections officers to Glock training; or [3] refusing to participate in or effectuate an unlawful, retaliatory reassignment of Grennon; and/or [4] any combination of the above reasons.

45. As a result of the unlawful termination, Plaintiff suffered lost pay and benefits, and suffered emotional distress, for which he seeks compensation.

**Wherefore, the Plaintiff requests that this Court order:**

a. that the Defendant(s) compensate Plaintiff for any loss of wages and/or benefits incurred as a result of his termination;

b. that the Plaintiff be awarded an amount of money which will fairly compensate him for his emotional and physical pain and suffering;

c. that the Plaintiff be awarded attorney's fees and costs.

d. that the Plaintiff be awarded punitive and/or multiplied damages.

e. that the Defendants pay the Plaintiff interest on any judgment entered from the time of filing of this suit;

f. such relief as may be just and proper and/or which will make the Plaintiff whole.

THE PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS OF HIS COMPLAINT.

The Plaintiff,
By his Attorneys

/s/ Robert S. Mantell
Kevin G. Powers, BBO #405020
Robert S. Mantell, BBO #559715
Rodgers, Powers & Schwartz
18 Tremont Street, Suite 500
Boston, MA 02108
(617) 742-7010

Michelman second amended complaint

# EXHIBIT 2

**Robert**

From: Cawley, Kathy [kcawley@scsdma.org]
Sent: Wednesday, May 24, 2006 9:35 AM
To: Robert Mantell
Subject: RE: Michelman

Rob,

On of behalf Defendants Suffolk County and the Suffolk County Sheriff's Department, I Kathleen M. Cawley, confirm that in the matter of *Michelman v. Suffolk County et. al*, Civil Action No. 05-CV-11577- RGS, Defendants Suffolk County and the Suffolk County Sheriff's Department waive and forfeit all defenses involving the Eleventh Amendment and/or sovereign immunity with regard to any Whistleblower claim brought pursuant to M.G.L. ch. 149 §185. This waiver does not constitute an acknowledgment or recognition that Defendant Suffolk County Sheriff's Department is a legal entity subject to suit.

Let me know if this is ok.

Kathy

# EXHIBIT 3

TO: Sheriff Cabral
Chief of Staff Keeley
FROM: Charlie Abate
RE: Martin Michelman
DATE: June 18, 2004

A pre-termination hearing was held on June 16, 2004 to determine whether there is just cause to terminate Deputy Superintendent Michelman from his *at will* position as the Sheriff's Director of Training. Michelman was present with his attorney, Doug Louison, and statements were presented by the Chief of Staff and Deputy Superintendent Viktor Theiss.

In this circumstance, just cause is defined as any reason not otherwise illegal.

Specifically, after reviewing my notes and recollections of the statements made by the Chief of Staff and Theiss about their respective tenures as Michelman's direct supervisor, I find that Michelman:

- had been repeatedly inappropriate and unprofessional in his dealings with fellow Department managers, most notably the Director of Personnel;
- had been disrespectful and derogatory in numerous internal e-mail communications;
- exceeded his authority when he unilaterally made decisions regarding the sheduling of TABE tests and fitness evaluations and the designation of SERT officers;
- embarrassed Sheriff Cabral when he snidely and publicly derided Hampshire County Sheriff Garvey in an external e-mail to other members of the Mass. Sheriff's Association training committee, which led to his written apology and resignation from the committee;
- continually advocated a larger and more public law enforcement role as a result of the convention than the Department indicated was either affordable or necessary, and despite the dedication of resources equivalent to his own proposal;
- sowed confusion and dissension amongst the command staff when he intimated that the Department was not prepared for the security demands of the upcoming Democratic National Convention despite having participated in and concurred with the Department's preparations;
- failed to produce, despite several requests, a curriculum for training command and other staff to meet the security demands for which he intimated the Department was unprepared;
- repeatedly disputed the Department's decision that small arms training qualified as in-service training for regulatory purposes; and
- in general, failed to sufficiently improve his communication and inter-personal skills despite intense and repeated direction and counselling.

I further find that his allegations of retaliation are unsupported by his own testimony. It was alleged that Theiss urged Michelman to remove one John Grennon as an instructor due to union activity, and that his termination is in retaliation for his opposition to that action; Michelman admitted, however, that Theiss actually urged removal of six of the



000366

eight instructors in Training for a variety of reasons related to job performance and competency, but demurred in response to Michelman's arguments. In Grennon's case, he also conceded that he had walked in on Grennon conducting union business on the telephone when he should have been performing training duties, and had warned him that this was unauthorized. Michelman alleged Theiss made numerous disparaging comments about Grennon and his public criticism of the Sheriff, yet admitted that he himself indicated to his supervisors that Grennon was "dangerous to the Department." Furthermore, as Michelman's supervisor, Theiss would have been within his rights to reassign instructors over Michelman's objections, yet, to this date, those six training instructors remain in their positions.

Through his attorney, Michelman also alleged that his termination on the heels of his DNC briefing qualify him as a "whistle blower." He indicated that while he did not intend to disrupt the plan in place, his truthful answers to questions from the audience, motivated by his concerns for public safety and the safety of Department employees, were understandably misperceived as criticism of the Department's preparedness. It is unclear, however, just where Michelman stands on this issue. He stated that he did not intend to criticize, either explicitly or implicitly, the Department's actions thus far, but in hindsight understands how they could be viewed that way. To me, this indicated that he did not disagree with the Department's plans, which Theiss stated he was intimately involved in and which Michelman supposedly praised when he advised the Boston Police a short time ago that the Department was in good shape. If he in fact was not criticizing the Department in his statements, than he cannot claim to be a "whistle blower."

If, however, he did in fact express his true opinions, it calls into question both his motives and his veracity. Theiss stated that Michelman had advocated a more aggressive and expansive law enforcement role than Theiss and others believed was either possible or necessary. Specifically, Michelman wanted to create and field a "tactical team" to fortify our the perimeter and protect each facility from siege or outright attack by protesters or anarchists, a plan ultimately disapproved by the Chief of Staff; Theiss described an alternative which would make available a roughly equivalent amount of personnel to secure the front and rear entrances of each facility in anticipation of both a police response and one from a NEMLEC team dedicated to our defense, an alternative Michelman had until now publicly embraced, both in his weekly meetings with the command staff and with outside agencies. His allusions to serious saftey concerns arising out of the site assessment by the head of the NEMLEC team, Chief Mills, were apparently never put into writing nor brought to the attention of Theiss, and thus appear to have been intended more to advocate for an expanded law enforcement role for the NEMLEC team rather than in response to any security deficiency in the Department. Finally, Michelman's comments at the June 10 briefing were contrary to those he had been making in the same venue for months, and to outside agencies.

Ultimately, if Michelman truly had public safety concerns of such moment that he feared for the safety of both the public and his fellow employees, he should have attempted to bring these concerns to the attention of Theiss, the Chief of Staff, or the Sheriff, his superiors in the chain of command; he did not.

I find that there is no merit in the allegations of retaliation.

000367